STATE OF NORTH CAROLINA v. JIMMY RAY WILLIAMS

No. COA10-11

(Filed 7 September 2010)

**Sexual Offenses— second-degree sexual offense—mentally disabled victim—sufficient evidence**

The trial court did not err in denying defendant's motion to dismiss a charge of second-degree sexual offense because the State presented substantial evidence of all the elements of the offense, including that the victim was mentally disabled and that defendant knew or should reasonably have known that the victim was mentally disabled.

---

STATE v. WILLIAMS

[207 N.C. App. 136 (2010)]

Appeal by defendant from judgment entered 1 July 2009 by Judge William Z. Wood, Jr. in Forsyth County Superior Court. Heard in the Court of Appeals 19 August 2010.

*Attorney General Roy A. Cooper, III, by Assistant Attorney General Sarah Y. Meacham, for the State.*

*Daniel J. Clifton, for defendant-appellant.*

JACKSON, Judge.

Defendant Jimmy Ray Williams appeals from a judgment entered 1 July 2009 upon a jury's verdict finding him guilty of second-degree sexual offense and crime against nature. For the reasons set forth below, we hold no error.

In May 2008, William Ray Epperson ("Epperson") had been living with his mother for forty-seven years. Epperson has an I.Q. of fifty-eight and is considered to have mild mental retardation. Epperson needs daily assistance with household chores and receives monthly disability checks for mental retardation. Defendant is Epperson's mother's boyfriend and has known Epperson for many years. Defendant often spent time with the family and frequently stayed overnight at Epperson's mother's house.

Towards the end of May 2008, Epperson helped defendant move a refrigerator at defendant's trailer. Epperson testified that after he helped move the refrigerator, he went into the bathroom to put up a shower curtain, and then he went into the bedroom where defendant performed fellatio on him. Epperson testified that defendant asked "if he could suck [Epperson's] dick" and that defendant told Epperson "not to tell." Epperson testified that he told defendant "no" but defendant performed fellatio anyway. Epperson also testified as to another occasion at his mother's house where defendant came into Epperson's bedroom and began performing fellatio on Epperson. On that occasion, Epperson told defendant "no," and defendant stopped. Because Epperson's mother's house is in Surry County and the indictment only charges crimes alleged to have been committed in Forsyth County, we only are concerned with the incident that took place at defendant's trailer in Forsyth County. A few days after the incidents defendant told his mother what had happened. Epperson also told his sister, two step-brothers, and Detective A.W. Adkins ("Detective Adkins") about the incidents.

On 22 September 2008, defendant was indicted on one count of second-degree sexual offense and one count of crime against nature. On 30 June 2009, a jury convicted defendant of both charges. On 1 July 2009, defendant was sentenced to sixty to eighty-one months imprisonment. Defendant appeals.

Defendant argues that the trial court erred in denying defendant's motion to dismiss the second-degree sexual offense at the end of all the evidence. We disagree.

We review the denial of a motion to dismiss *de novo*. *State v. Robledo*, 193 N.C. App. 521, 525, 668 S.E.2d 91, 94 (2008) (*citing State v. Bagley*, 183 N.C. App. 514, 523, 644 S.E.2d 615, 621 (2007)). In order to survive a motion to dismiss, the State must have presented substantial evidence as to each essential element of the offense charged and as to defendant's identity as the perpetrator. *State v. Scott*, 356 N.C. 591, 595, 573 S.E.2d 866, 868 (2002).

> When ruling on a motion to dismiss for insufficient evidence, the trial court must consider the evidence in the light most favorable to the State, drawing all reasonable inferences in the State's favor. Any contradictions or conflicts in the evidence are resolved in favor of the State, and evidence unfavorable to the State is not considered. The trial court must decide only whether there is substantial evidence of each essential element of the offense charged and of the defendant['s] being the perpetrator of the offense. Substantial evidence is relevant evidence that a reasonable mind might accept as adequate to support a conclusion. When the evidence raises no more than a suspicion of guilt, a motion to dismiss should be granted. However, so long as the evidence supports a reasonable inference of the defendant's guilt, a motion to dismiss is properly denied even though the evidence also permits a reasonable inference of the defendant's innocence.

*State v. Miller*, 363 N.C. 96, 98-99, 678 S.E.2d 592, 594 (2009) (internal citations and quotation marks omitted).

To support the charge of second-degree sexual offense, the State was required to present substantial evidence that the defendant (1) engaged in a sexual act; (2) with a person who is mentally disabled, mentally incapacitated, or physically helpless; and (3) knew or should reasonably have known that the other person is mentally disabled, mentally incapacitated, or physically helpless. N.C. Gen. Stat. § 14-27.5(a)(2) (2009). Defendant does not deny that he engaged in a

sexual act with Epperson. However, defendant contends that there was insufficient evidence that Epperson is mentally disabled pursuant to North Carolina General Statutes, section 14-27.1(1), and insufficient evidence that defendant knew or should reasonably have known that Epperson was mentally disabled.

Defendant first contends that there was insufficient evidence that Epperson was mentally disabled pursuant to North Carolina General Statutes, section 14-27.1(1). We disagree.

North Carolina General Statutes, section 14-27.1(1) defines "mentally disabled" as:

> (i) a victim who suffers from mental retardation, or (ii) a victim who suffers from a mental disorder, either of which temporarily or permanently renders the victim substantially incapable [(a)] of appraising the nature of his . . . conduct, or [(b)] of resisting . . . a sexual act, or [(c)] of communicating unwillingness to submit to . . . a sexual act.

N.C. Gen. Stat. § 14-27.1(1) (2009). "[O]ne who is 'mentally [disabled]' under the sex offense laws is 'statutorily deemed incapable of consenting' to intercourse or other sexual acts." *State v. Washington*, 131 N.C. App. 156, 167, 506 S.E.2d 283, 290 (1998) (quoting *State v. Holden*, 338 N.C. 394, 406, 450 S.E.2d 878, 884 (1994)).

Defendant relies upon *State v. Oliver*, 85 N.C. App. 1, 354 S.E.2d 527 (1987), to support his argument that Epperson was able to appraise the nature of his conduct and communicate an unwillingness to receive oral sex, and therefore, was not "mentally disabled." *Id., cert. denied*, 320 N.C. 174, 358 S.E.2d 64, *supersedeas denied*, 320 N.C. 174, 358 S.E.2d 65 (1987). In *Oliver*, the victim was a sixteen-year-old who functioned at an eight-year-old level and had a full scale I.Q. of sixty-six or less. *Id.* at 4, 354 S.E.2d at 529. Expert testimony established that the victim in certain circumstances was capable of appraising the nature of her conduct. *Id.* at 18, 354 S.E.2d at 537. The victim also testified that she verbally protested the sexual abuse. *Id.* at 20, 354 S.E.2d at 538. Accordingly, we held that "the State's evidence was not sufficient to show the victim was substantially incapable of 'appraising the nature of . . . her conduct' or 'communicating unwillingness to submit to the . . . sexual act.'" *Id.* at 18, 354 S.E.2d at 537. However, based upon expert testimony that the victim would find it very difficult to disobey an authority figure, we also held that there was "sufficient evidence to support a finding that the victim was substantially incapable of 'resisting the . . . sexual act.'" *Id.* Specifically, we ruled that

the element of "substantially incapable of . . . resisting the . . . sexual act" is not negated by the victim's ability to verbally protest or even to engage in some physical resistance of the abuse. The words "substantially incapable" show the Legislature's intent to include within the definition of "mentally [disabled]" those persons who by reason of their mental retardation or disorder would give little or no physical resistance to a sexual act.

*Id.* at 20, 354 S.E.2d at 538. Accordingly, "[v]iewed in the light most favorable to the prosecution, we [found] the evidence sufficient to support the trial court's denial of defendant['s] motion for nonsuit." *Id.* at 20-21, 354 S.E.2d at 538.

In the case *sub judice*, both parties agreed that the evidence tended to show that Epperson was capable of appraising the nature of his conduct and of communicating an unwillingness to submit to a sexual act. The element at issue is whether Epperson was substantially capable of resisting a sexual act. Expert testimony showed that Epperson had a full scale I.Q. of fifty-eight, placing him in the range of mild mental retardation. The expert witness testified that Epperson "had difficulty expressing himself verbally"; "was able to read very simple words like go, cat, [and] in"; "was able to solve very simple addition and subtraction problems"; and "had difficulty answering questions about social abilities, every-day-life tasks." Epperson's sister testified that Epperson needed daily assistance with "[c]ooking, washing his clothes, [and] making sure he brushed his teeth." During trial, the following exchange occurred:

[Defendant's counsel]: [D]id [defendant] ask you if he could suck your dick?

[Epperson]: Yeah.

[Defendant's counsel]: And what did you say when he asked you that?

[Epperson]: He told me not to tell at the trailer. That's what he told me.

[Defendant's counsel]: Well, did he ask you—well, what did [you] say when he asked you that question?

[Epperson]: I told him no.

[Defendant's counsel]: And then what did he do?

[Epperson]: He suck[ed] it.

Epperson testified that he did not want defendant to "suck [his] dick" and Epperson had also told Detective Adkins that he did not want the incident to take place. In the light most favorable to the State, notwithstanding Epperson's communication of his unwillingness to receive oral sex, defendant completed the sexual act, allowing an inference that Epperson was unable to resist the sexual act. As a "person who by reason of [his] mental retardation or disorder would give little or no physical resistance to a sexual act," Epperson falls within the Legislature's definition of "mentally [disabled]." *See Oliver,* 85 N.C. App. at 20, 354 S.E.2d at 538. When taken in the light most favorable to the State, a reasonable juror could find that Epperson was substantially incapable of resisting a sexual act and was "mentally disabled" pursuant to North Carolina General Statutes, section 14-27.1(1). Accordingly, defendant's first argument is without merit.

Defendant next contends that there was insufficient evidence that defendant knew or reasonably should have known that Epperson was mentally disabled because defendant is unable to discern a difference in mental capability between Epperson and himself. We disagree.

In support of this contention, defendant relies on the following testimony by expert witness Dr. Ashley King ("Dr. King"):

[Defendant's counsel]: [D]id [defendant] make any comparisons between he [sic] and Mr. Epperson?

[Dr. King]: Yes, he did.

[Defendant's counsel]: What did he say that Mr. Epperson was able to do?

[Dr. King]: Let's see. He said that he could read, work in the yard, clean the house and fix a lawnmower. And he said, quote, "he seemed just like me, but he could read and write," end quote.

[Defendant's counsel]: So based upon those statements that were made by [defendant] to, would you think he was able to discern a difference between him and Mr. Epperson?

[Dr. King]: I wouldn't base that . . . making that discernment on those statements or on any single piece of data.

[Defendant's counsel]: Well, based on all of your data then, not just that one particular statement, but based on all of your data, do you think that he would be able to discern the difference between he [sic] and Mr. Epperson?

[Dr. King]: I think that it might be difficult for him. I mean, he might—he might notice that there were things about Mr. Epperson that were different, like him repeating things over and over, but I don't know that he would conclude from that that Mr. Epperson was mentally retarded.

Dr. King testified that based upon her evaluation, her diagnosis was that he had "borderline intelligence," placing him "between below average and mild mental retardation." Dr. King testified that "[she] wasn't able to successfully test [defendant]" because she thought that "[defendant] was trying to . . . seem a little bit less intelligent than he actually is during [their] interview." Dr. King testified that defendant was "malingering . . . so much so that [she] could not use the tests at all[;] in fact, [she] had to discard the whole process." Dr. King also testified that defendant's 2004 test result of a full scale I.Q. of fifty-four was inaccurate because defendant was able to drive a forklift and a car, tasks that she would expect someone with an I.Q. between seventy and eighty to perform. Dr. King agreed with the statement that, at the time of the 2004 test, defendant had a "huge reason to malinger because the result could be . . . a monthly [disability] check." Defendant also knew that Dr. King's evaluation was in preparation for her testimony at defendant's trial. When asked whether "[defendant] would . . . be in a position to recognize some mental deficits in talking with someone who, in fact, has a mental deficit," Dr. King responded, "I would think it would depend upon how pronounced [the mental deficits] were and how different they were from what [defendant's] idea of normal was."

In contrast, the State's evidence tended to show that Epperson displayed many signs of mental disability. Detective Adkins testified that, within three minutes of talking with Epperson, "it became clearly obvious . . . that [Epperson] had some deficits." However, Detective Adkins testified that, during an interview with defendant later on that same day, "[d]efendant appeared [to be] a normal and healthy adult male. And the only deficits that [Detective Adkins] determined in conducting [the] interview was his inability to read or write." Evidence also showed that defendant had a driver's license, held regular jobs, took care of Epperson's mother when she was sick by cooking meals and making sure she took her medication, could connect a VCR, and could read "somewhat." Epperson, on the other hand, could not drive, never has held a regular job, only could cook food in a microwave, had to be reminded to brush his teeth, did not know how to connect a VCR, and could not read.

Moreover, defendant had sufficient opportunity to get to know Epperson as more than just a casual observer. Prior to the charges against defendant, Epperson lived with his mother for forty-seven years. During the thirteen years defendant dated Epperson's mother, defendant spent one or two nights a week at Epperson's mother's house and "hung out with the family." Therefore, defendant had ample opportunity, or reasonably should have discovered, Epperson's mental disability. Defendant's offer to Epperson of a Pepsi or $10.00 to have oral sex is a strong indication that defendant actually did know that Epperson functioned at the level of a child or person with a mental disability. Taken in the light most favorable to the State, a reasonable juror could find that defendant knew or should have reasonably known that Epperson was mentally disabled. Accordingly, this argument fails. We hold that there was sufficient evidence to support the trial court's denial of defendant's motion to dismiss.

For the foregoing reasons, we hold no error.

No Error.

Judges GEER and BEASLEY concur.